IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DONALD McGRAW, ) | |
| ) | |
| Petitioner, ) | No.   04 C 2804 |
| v. ) | |
| ) | Judge Robert W. Gettleman |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Respondent. ) | |

## MEMORANDUM OPINION AND ORDER

On April 19, 2004, after being tried and convicted and having his conviction and sentence affirmed on appeal, Donald McGraw ("petitioner") filed a petition to vacate pursuant to 28 U.S.C. § 2255. Because the court finds that petitioner's claims are either procedurally barred or without merit, the § 2255 petition is denied.

On May 24, 2004, petitioner filed a motion to issue a subpoena to the Chicago Police Department for video surveillance tapes and audio tapes in connection with his § 2255 motion. Petitioner renewed his motion on February 3, 2005, with respect to the surveillance tapes.[1] For the reasons explained below, the court denies petitioner's motion to issue a subpoena.

---

[1] The second part of petitioner's original motion to issue a subpoena was to compel the government to produce "other audio tapes never produced before," including undercover tapes that petitioner alleges were made of him and his co-conspirators. Petitioner does not mention audio tapes in his renewed motion. The government states in its response that it does not understand what audio tapes petitioner was referring to, and that it believes that all known audio tapes discoverable under Fed. R. Crim. P. 16 and/or Brady v. Maryland, 373 U.S. 83 (1963), were produced during pre-trial discovery. The court treats the renewed motion as regarding the video surveillance tapes only, and as abandoning petitioner's request for a subpoena for other materials.

## BACKGROUND[2]

Petitioner and two co-defendants, John Rose ("Rose") and Gerald Ward ("Ward"), were indicted in November 1999. Soon afterwards, Rose struck a deal with the government and a superceding indictment was issued against Ward and petitioner. Petitioner was charged with three counts: (1) possession with intent to distribute cocaine base under 21 U.S.C. § 841(a)(1) (Count I); (2) conspiracy to possess with intent to deliver cocaine base under 21 U.S.C. § 846 (Count II); and (3) theft of $8,588 in United States government funds 18 U.S.C. §§ 641 and 642 (Count III). Attorney Ronald Clark ("Clark") represented petitioner at a jury trial that began on September 25, 2000, and concluded on October 4, 2000. Petitioner was convicted on all counts of the superseding indictment.

Approximately one month prior to sentencing, Clark was granted leave to withdraw and attorney Sheldon Nagelberg ("Nagelberg") was appointed to represent petitioner at sentencing. On June 18, 2001, this court sentenced petitioner to 121 months' imprisonment on Counts I and II, and to 120 months' imprisonment on Count III, all to run concurrently. Petitioner appealed to the Seventh Circuit, which upheld his conviction and his sentence. United States v. McGraw, 2003 WL 1796021 (7th Cir. Mar. 27, 2003)(unpub. opinion). The mandate issued on April 18, 2003, and petitioner's timely § 2255 motion was filed on April 19, 2004.

During the 1990s, petitioner, Rose, and Ward were officers with the Chicago Housing Authority ("CHA") Police Department. During 1998 and 1999, Rose and Ward were partners, and provided petitioner with back-up assistance when needed, and petitioner and his partner did

---

[2]A fuller recitation of the facts of this case can be found in the Seventh Circuit order. United States v. McGraw, 2003 WL 1796021 (7th Cir. Mar. 27, 2003)(unpub. opinion).

the same for Rose and Ward. In 1998, a drug dealer named Nazario Hernandez ("Hernandez") became an informant for Rose, who paid Hernandez with single-use bags of heroin, crack cocaine, and marijuana. Rose testified at trial that petitioner supplied two of the bags of crack cocaine with which he paid Hernandez.

The bulk of the government's evidence at trial centered around three separate incidents involving thefts by petitioner and other former CHA officers: (1) the theft of crack cocaine and a gun in connection with the arrest of Able Collins ("Collins") on November 25, 1998; (2) the theft of crack cocaine in connection with the arrest of Tony Smith ("Smith") on February 25, 1999; and (3) the theft of approximately $8,588 in cash on March 5, 1999.

Rose testified at that on November 25, 1998, petitioner notified Ward and Rose of drug dealing at a CHA housing development, and all three officers went to the location. The officers encountered two teenagers, Willie Martin ("Martin") and Collins. Collins was holding a bag of crack cocaine. The officers apprehended Collins and seized the bag of crack cocaine, and pursued Martin into an apartment in the building. Rose and Ward searched the apartment and found a ball of crack cocaine, which Rose testified Ward gave to petitioner. The ball of crack cocaine was never inventoried as evidence. According to Rose, he made an agreement with petitioner that petitioner would sell the ball of crack cocaine and split the money with Rose.

On February 25, 1999, Rose, Ward, petitioner, and petitioner's partner responded to a call at an apartment in an CHA building, and observed Smith throw what was later discovered to be ten bags of crack cocaine out the window. Rose and petitioner subsequently searched the apartment and found a large zip-top bag with a picture of an apple on it. The bag contained several smaller plastic bags containing crack cocaine, and a ball of crack cocaine. Smith

admitted that the bag belonged to him, and was arrested. Rose testified that when the officers left the apartment on February 25, 1999, petitioner was holding the crack cocaine they had seized. According to Rose, he met petitioner later that day outside the East District police station at 38th and Cottage Grove, where petitioner showed Rose the zip-top bag containing the cocaine. Rose testified that he took the larger zip-top bag, leaving petitioner with the smaller bags.

Unbeknownst to Rose or petitioner, by February 1999, Hernandez had begun to cooperate with the FBI, and the FBI had recorded several conversations between Rose and Hernandez. During a call recorded on February 26, 1999, Rose told Hernandez that he had a "boulder" or a "ball" for him. At trial, Rose testified that he was referring to the ball of crack cocaine seized from Smith on February 25, 1999, which Rose later gave to Hernandez in exchange for two jackets.

Rose testified at trial that Hernandez called him on March 5, 1999, and told him that someone was cooking cocaine into crack cocaine in apartment 708 at the CHA's Harold Ickes development, and that $10,000 was hidden in a heater vent of that apartment. According to Rose, he shared this information with petitioner. Later that day, Rose, petitioner, and petitioner's partner went to apartment 708 and discovered a cocaine cooking operation. Rose located the money described by Hernandez inside a radiator cover and gave the money to petitioner. Rose testified that the three officers then went to petitioner's apartment to divide the money. None of the officers collected any of the drug paraphernalia from apartment 708 as evidence, and none of the money was logged as evidence.

4

# HABEAS CORPUS STANDARD

Section 2255 allows a person convicted of a federal crime to vacate, set aside, or correct his sentence. This relief is available only in limited circumstances, such as where an error is jurisdictional, constitutional, or there has been a "complete miscarriage of justice." See Harris v. United States, 366 F.3d 593, 594 (7th Cir. 2004); Bischel v. United States, 32 F.3d 259, 263 (7th Cir. 1994) (internal quotations and citations omitted). The record is reviewed and all reasonable inferences are drawn in favor of the government. See United States v. Galati, 230 F.3d 254, 258 (7th Cir. 2000); Messinger v. United States, 872 F.2d 217, 219 (7th Cir. 1989).

Section 2255 petitions are subject to various bars, including procedural default. The Seventh Circuit has noted that § 2255 petitions are "'neither a recapitulation of nor a substitute for a direct appeal.'" McCleese v. United States, 75 F.3d 1174, 1177 (7th Cir. 1996)(citations omitted). Therefore, a § 2255 motion cannot raise: (1) issues that were raised on direct appeal, unless there is a showing of changed circumstances; (2) non-constitutional issues that could have been raised on direct appeal, but were not; and (3) constitutional issues that were not raised on direct appeal. See Belford v. United States, 975 F.2d 310, 313 (7th Cir. 1992)(overruled on other grounds by Castellanos v. United States, 26 F.3d 717 (7th Cir. 1994)). An ineffective assistance of counsel claim may be brought in a § 2255 motion regardless of whether the claim was raised on appeal. Massaro v. United States, 538 U.S. 500, 504 (2003).

# DISCUSSION

## I. Ineffective assistance of counsel

Petitioner argues that Clark, his trial counsel, was constitutionally ineffective on eight grounds. To prevail on his claim of ineffective assistance of counsel, petitioner must show that

5

his counsel's conduct "fell below an objective standard of reasonableness" and "outside the wide range of professionally competent assistance." Strickland v. Washington, 466 U.S. 668, 690 (1984). To succeed on a § 2255 petition, petitioner's counsel's errors must be so serious "as to deprive the petitioner of a fair trial, a trial whose result is reliable." Lockhart v. Fretwell, 506 U.S. 364, 369-70 (1993)(quoting Strickland, 466 U.S. at 687). In other words, petitioner "must establish that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Benefiel v. Davis, 357 F.3d 655, 662 (7th Cir. 2004)(quoting Strickland, 466 U.S. at 694).

Because the court begins with a strong presumption that counsel's conduct falls within the wide range of acceptable professional assistance, petitioner faces a heavy burden in making out a winning ineffective assistance of counsel claim. See Strickland, 466 U.S. at 690; United States v. Ruzzona, 247 F.3d 688, 696 (7th Cir. 2001).

No plea offer ever communicated

Petitioner claims that Clark failed to communicate any plea offer to him. Counsel generally has a duty to inform clients of all plea agreements offered by the government and to permit the client's involvement in decision-making. United States v. Golden, 102 F.3d 936, 943 (7th Cir. 1996); Johnson v. Duckworth, 793 F.2d 898, 901 (7th Cir. 1986)(collecting cases). The failure to do so ordinarily constitutes ineffective assistance. Golden, 102 F.3d at 943. Even assuming that petitioner's claim that Clark failed to communicate a plea offer to him, thereby likely rendering ineffective assistance, petitioner fails to satisfy the prejudice prong of this ground for his ineffective assistance claim.

To establish prejudice concerning a possible plea agreement, the petitioner "must show (1) through objective evidence that (2) there is a reasonable probability that, but for counsel's inadequate performance, he would have accepted the government's offer." Paters v. United States, 159 F.3d 1043, 1047 (7th Cir. 1998); See also Johnson, 793 F.2d at 902 n. 3(noting in dicta that the movant would be unlikely to establish the prejudice prong because he "does not argue or allege...that there is a reasonable probability that, but for counsel's errors, he would have accepted the plea agreement."). Petitioner devotes only one line of his motion to his claim that Clark failed to communicate any plea offer, and he does not suggest that he had any interest in entering a guilty plea. Clark states in his affidavit in response to petitioner's § 2255 motion that he advised petitioner of overtures by the government on "numerous occasions," but that petitioner was "adamant in asserting his absolute innocence and became incensed whenever counsel communicated any overture" by the government. Clark adds that petitioner "forbade the Defendant from negotiating with the Government." The court understands this to mean that petitioner instructed Clark not to negotiate with the government on petitioner's behalf.

Petitioner does not argue the he would have accepted a plea offer, and thus fails to demonstrate that he was prejudiced. Clark's performance was therefore not ineffective regarding any plea offer by the government. See Liscak v. United States, 2004 WL 2646671, at *4 (N.D. Ill. Nov. 19, 2004)(denying §2255 petition on ground of failure to communicate plea offer because petitioner did not indicate that he would have accepted a plea offer).

Failure to provide probation officer with an alternative drug quantity

Petitioner next argues that Clark erred by failing to contest the drug quantity stated by the probation officer in the pre-sentence report ("PSR"). The PSR states, "This officer requested that

7

Ronald Clark, counsel for the defendant, provide this officer with an opinion as to the amount of crack cocaine for which the defendant should be held accountable. To date, no such information has been received by this office." Clark states in his affidavit that he made a strategic decision, based on his experience, to focus his efforts on persuading the court, rather than the probation office, of the merits of the defense position regarding drug quantity. More significantly, Clark did not represent petitioner at sentencing, but only at trial, at which the PSR, which relates solely to sentencing, did not yet exist. Petitioner suggests that Clark's failure to challenge the quantity in the PSR created difficulties for Nagelberg, who represented him at sentencing. Nagelberg, however, filed a sentencing memorandum and presented argument at sentencing vigorously challenging the government's position concerning drug quantity. Although the court voiced its displeasure that Nagelberg had not filed his sentencing position until the day of sentencing, the court considered Nagelberg's arguments on petitioner's behalf. The court found that there was sufficient evidence in the record to support the jury's determination that the conspiracy involved more than five grams of crack cocaine, and accepted the finding in the PSR that petitioner was responsible for more than 35 grams and less than 50 grams. The Seventh Circuit upheld the court's findings regarding quantity. McGraw, 2003 WL 1796021, at *3. Accordingly, Clark's decision not to challenge the PSR was not objectively unreasonable.

Failure to object to hypotheticals

Petitioner also argues that Clark was ineffective because he failed to object to hypotheticals "posed by the prosecution" during its cross examination of defense witness Carl Washington ("Washington"), a former CHA officer. Petitioner devotes one sentence only to this ground for his ineffective assistance claim. In support of his argument, petitioner attaches a page

8

of the trial transcript containing the court's observation after Washington's testimony that neither attorney had objected to "all the hypotheticals that [Washington] went into." Petitioner does not point to a specific hypothetical, attach portions of the trial transcript containing a hypothetical, or explain how he was prejudiced by portions of Washington's testimony that were admitted due to Clark's failure to object. The government, however, attaches portions of the transcript containing several hypotheticals posed by Clark during his direct examination of Washington. For example, Washington testified in response to Clark's hypotheticals that contradicted the testimony of CHA investigator Virginia Chentis ("Chentis"), a prosecution witness, about CHA's practices regarding vacant apartments containing evidence of drug activity. In response to a hypothetical posed by Clark about the police station Washington testified, "That would be about the absolute worst place for somebody to do [a drug transaction], because they would be in plain view of the desk. They would be caught...one of the cameras is trained on that area near the ramp in the front."

The court cannot see, and petitioner does not explain, how hypothetical situations used by his lawyer to elicit testimony that rebutted the testimony of at least two government witnesses demonstrates ineffective assistance of counsel or was prejudicial to petitioner. Further, even assuming that the government may have also used hypothetical scenarios and that Clark could have objected to some of them, petitioner fails to offer evidence of any prejudice to him stemming from Clark's failure to do so.

Failure to call

Petitioner asserts that Clark should have called a number of witnesses to the stand. A lawyer's decision to call or not to call a witness is a strategic opinion that is generally not subject

9

to review. Valenzuela v. United States, 261 F.3d 694, 699-700 (7th Cir. 2001); United States v. Balzano, 916 F.2d 1273, 1294 (7th Cir. 1990). In rare cases, an attorney's failure to investigate or call certain witnesses can constitute ineffective assistance of counsel. See Sullivan v. Fairman, 819 F.2d 1382, 1390 (7th Cir. 1987); Berry v. Gramley, 74 F. Supp. 2d 808 (N.D. Ill. 1999). "Where a petitioner claims his trial counsel failed to call a witness, he must make a specific, affirmative showing as to what the missing evidence would have been, and prove that this witness's testimony would have produced a different result." Patel v. United States, 19 F.3d 1231, 1237 (7th Cir. 1994)(citations omitted).

For the reasons discussed below, petitioner fails to show that any of his attorney's decisions regarding the presentation of witnesses at trial were unreasonable at the time they were made. Counsel's performance regarding this strategic decisions were therefore not ineffective. See Harris v. Reed, 894 F.2d 871, 877 (7th Cir. 1990)("objectively reasonable strategic decisions...are virtually unchallengeable.").

Petitioner argues that Clark should have called Nazario Hernandez to the stand. If called, petitioner argues, Hernandez "could have potentially demonstrated a much lesser role in the conspiracy" of petitioner. In support of this argument, petitioner cites to a comment the court made to Clark during trial that, "You could always call [Hernandez], Mr. Clark. You know I said that a long time ago." Petitioner does not describe any specific testimony that Hernandez would have given, only that he "could have provided valuable exculpatory testimony." Clark's decision not to call Hernandez appears to have been part of a defense strategy to distance petitioner from Hernandez, a drug dealer who Clark specifically argued at trial had no contact with petitioner. Clark also states that he learned from Hernandez's attorney that Hernandez would "bury"

petitioner if called. The government did not call Hernandez and never argued that Hernandez had provided any incriminating information evidence against petitioner. Petitioner fails to articulate what he could have gained by calling Hernandez, and the government offers evidence that calling Hernandez could have been detrimental to petitioner at trial. Accordingly, Clark's decision not to call Hernandez was not objectively unreasonable.

Petitioner also argues that Clark should have called several CHA officers. Petitioner first asserts that co-defendant Ward should have been called, stating only that his testimony "was potentially valuable to the defense." Petitioner fails to identify any specific exculpatory evidence that Ward would have offered if called, and his allegations are thus purely speculative and insufficient. See Patel, 19 F.3d at 1237. Indeed, Ward would likely have exercised his Fifth Amendment right not to testify.

Petitioner next states that CHA commander Barker ("Barker") could have testified that he assigned Rose and petitioner to work certain cases together, which petitioner argues would have rebutted the prosecution's "strong inference" that Rose and petitioner conspired to work the cases together. Although Clark did not call Barker, who Clark states revealed at an interview that he "had nothing to say that would in any way have helped [petitioner]," Clark called another witness to rebut the inference. Reginald Harris ("Harris"), petitioner's partner, testified for the defense that he and petitioner had a standing order from Barker to provide back-up for Ward and Rose. Barker's testimony, therefore, would have been cumulative, and petitioner was not prejudiced by Clark's decision not to call Barker.

11

In addition to Barker, petitioner asserts that CHA officers Vertis Holmes ("Holmes") and Paul Leslie ("Leslie")[3] should have been called because they were present during the March 5, 1999, incident, and "could have potentially balanced the testimony of [Chentis] who clearly implied that more evidence should have been seized" from the apartment. Again, petitioner fails to specify how the testimony of these witnesses would have aided the defense. Clark states in his affidavit that he was reluctant to call Holmes or Leslie because they were unwilling to testify, they were not in a position to view events inside the apartment on March 5, 1999, and the testimony of another CHA officer called by Clark had been unhelpful and potentially damaging. Further, Clark elicited testimony rebutting Chentis's claim that it was normal procedure to seize and inventory narcotics paraphernalia found in a vacant apartment from at least three witnesses. Williams, Ward, and Washington testified that such paraphernalia was not always seized and inventoried, and the court noted during Ward's testimony that "this is getting a bit cumulative." Any testimony by Holmes or Leslie, therefore, would have been similarly cumulative, and petitioner has failed to show how he was prejudiced by not calling them. Clark was not ineffective in failing to call Holmes or Leslie.

Lastly, petitioner argues that Clark should have called Collins, the drug dealer arrested during the November 25, 1998, incident. Petitioner states that Willie Martin and Rose provided different versions of the events on November 25, and that Collins was the only person who was aware of the quantity and type of narcotics involved in that transaction. As with several other witnesses, petitioner fails to identify any specific exculpatory evidence that Collins would have

---

[3] The government states that the correct spelling Laslic.

offered if called, and his allegations are thus purely speculative and insufficient. See Patel, 19 F.3d at 1237.

Lack of preparation

Petitioner asserts that "several times during the trial Mr. Clark demonstrated a severe lack of preparation." Petitioner, however, identifies only one instance in which Clark was unprepared, when he did not have copies of the transcripts of certain FBI tapes for the jury. Although petitioner does not specify, it appears that he is referring to tapes of two conversations between Rose and Hernandez from March 5, 1999. Even though Clark did not provide transcripts of the tapes to the jury, he introduced these tapes and quoted verbatim from the transcripts during trial. As the court instructed the jury, transcripts of recordings introduced are not evidence, but are merely a guide to assist jurors as they listen to recordings. Clark's failure to have copies of transcripts therefore had little, if any, significance, and was not ineffective assistance of counsel.

Failure to subpoena videotapes from surveillance cameras outside station

Petitioner identifies Clark's failure to subpoena videotapes from the surveillance cameras at the 38th Street police station from February 25, 1999, as a "major ineffective point." Petitioner argues that the tapes would show that contrary to Rose's testimony, petitioner and Rose did not exchange crack cocaine outside the police station. Petitioner states that he spoke to Clark about the tapes and what he maintained they would show, or not show, and that he assumed that Clark was getting the tapes.

Clark states in his affidavit that at petitioner's request, he spoke to his witnesses but none of them knew of any tapes that were preserved. He was also told that no depository existed for

13

such tapes at the time petitioner was indicted, and that the cameras outside the station were merely to deter theft and never worked. Although he did not have the tapes, Clark rebutted Rose's testimony through defense witness Washington, who testified that the surveillance equipment made the area outside the station "the absolute worse place" for a drug transaction. During his closing argument, Clark derided Rose's testimony that he had removed cocaine from the bag, "in front of the windows, and...in front of the cameras in front of the station." Even without the tapes, Clark challenged Rose's credibility regarding the alleged exchange outside the station.

Even if Clark had located the tapes and the tapes did not show petitioner and Rose exchanging cocaine, as petitioner argues they would not, it is unlikely this would have affected the outcome of the trial. Petitioner suggests that the tapes could be used to prove his innocence, but the government argues that even if the exchange was not captured by the cameras, this does not prove that Rose and petitioner did not make the exchange, but only that they were not within the range the surveillance cameras. That is, whatever the content of the tapes, they would not be dispositive because petitioner is attempting to prove a negative - that the drug exchange did not occur. Because Clark did some investigation of the tapes and challenged Rose's credibility at trial, and the surveillance tapes would not likely have been dispositive, Clark was not ineffective for failing to subpoena the tapes.

Failure to introduce tapes of Ward recordings

Lastly, petitioner claims that Clark should have introduced the tape recordings made by petitioner's co-defendant Ward when Ward was cooperating with the government. The prosecution did not present these tapes at trial, and petitioner infers from this that the tapes either

showed no criminal activity or provided exculpatory evidence. Similar to his argument regarding the surveillance tapes, petitioner offers only speculation that the tapes would be advantageous to him or that the absence of certain evidence on a particular recording could have been used to prove a negative. Such speculation is insufficient to overcome the high standard required to establish ineffective assistance of counsel, and petitioner has presented no evidence that Clark's failure to introduce the recordings was ineffective assistance.

## II. Court's errors

Petitioner asserts that the court made two errors during sentencing in its determination of the quantity of drugs attributable to petitioner and its calculation for the theft of government property. Petitioner also argues that the court should not have admitted Crack Cocaine Exhibit 3 ("Exhibit 3") at trial because a proper chain of custody had not been established.

Two of these claims, regarding the quantity of drugs and Exhibit 3, were already litigated before this court and the court of appeals. Matters that are not jurisdictional or harmful constitutional errors are not subject to collateral review. See United States v. Addonizio, 442 U.S. 178, 184 (1979)(§ 2255 provides redress for jurisdictional or harmful constitutional errors, and most non-constitutional violations of federal law are not cognizable on collateral review); Scott v. United States, 997 F.2d 340, 342 (7th Cir. 1993)("One full and fair opportunity to make arguments under the Guidelines - at sentencing and on direct appeal - is enough."). During trial, petitioner challenged the admissibility of Exhibit 3, which was ultimately admitted. The admission was appealed, and the Seventh Circuit upheld the court's finding. 2003 WL 1796021, at *3. Similarly, petitioner contested the quantity of drugs attributable to him at sentencing, and this court found him accountable for more than 35 grams of cocaine base. Petitioner appealed his

sentence and the Seventh Circuit upheld the court's finding. Id. Petitioner is thus barred from raising these grounds again in his petition for habeas corpus relief.

Petitioner's final claim is that the court erred in its Sentencing Guideline calculation for Count III, theft of government property. Petitioner did not challenge this aspect of his sentencing calculation on direct appeal, and is thus barred from raising it now. See Belford v. United States, 975 F.2d 310, 313 (7th Cir. 1992)(§ 2255 motion cannot raise non-constitutional issues that could have been raised on direct appeal, but were not). Even if this claim were not procedurally barred, it is without merit. Count III was grouped with Counts I and II for Guideline purposes, and petitioner's Count III sentence runs concurrently with the longer sentence imposed on Counts I and II. Petitioner's offense level for Count III was therefore tied to the higher offense level for the drug offenses (Counts I and II) which, as discussed above, was not in error and is longer than his sentence under Count III. A reduction in the offense level for Count III, therefore, would not have affected petitioner's sentence.

Accordingly, petitioner has identified no errors by this court at trial or sentencing that could form the basis for habeas corpus relief.

## III.  Blakely

On August 16, 2004, petitioner filed a motion to amend his § 2255 petition to incorporate the Supreme Court's ruling in Blakely v. Washington, 124 S.Ct. 2531 (2004). Petitioner argues that under Blakely it was error to sentence him pursuant to a Guideline range higher than the five grams of crack-cocaine found by the jury. Petitioner was convicted and sentenced almost four years prior to the Supreme Court's ruling in Blakely. The government argues that petitioner's reliance on Blakely is premature absent a Supreme Court ruling that Blakely applies

retroactively. Subsequent to the filing of the government's brief, the Seventh Circuit held that United States v. Booker, 125 S.Ct. 738 (2005), which addressed the Sixth Amendment's application to the Guidelines, does not apply retroactively. McReynolds v. U.S., 397 F.3d 479, 481 (7th Cir. 2005). Several district courts have properly applied McReynolds to hold that Blakely also does not apply retroactively. See, e.g., United States v. Gholson, 2005 WL 388569, at *10 (N.D. Ill. Feb 14, 2005); Johnson v. Briley, 2005 WL 309537, at *3 (N.D. Ill. Feb. 7, 2005). Accordingly, the petition is dismissed on the Blakely grounds.

## IV. Subpoena for surveillance tapes

On February 3, 2005, petitioner filed a renewed motion to issue a subpoena to the Chicago Police Department for video surveillance tapes pursuant to Rule 6(a) of the Rules Governing Section 2255 Proceedings, which permits a court to authorize discovery by a § 2255 petitioner "in the exercise of his discretion and for good cause." Good cause will be found where "specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is...entitled to relief...." Bracy v. Gramley, 520 U.S. 899, 904 (1997)(quoting Harris v. Nelson, 394 U.S. 386, 300(1969)).

Petitioner attaches to his renewed motion the affidavit of Robert Williams, a former employee of the CHA Police Department who worked at the police station on 38th Street. Williams states that on February 25, 1999, when Rose testified he exchanged drugs with petitioner, the monitoring and recording devices at the station were working. Williams also states that it was department protocol for the tapes to be retrieved by the "Evidence and Recovered Property Person." As discussed above, there is no reason to issue a subpoena for these tapes, which the government maintains do not exist, because petitioner has not shown good

17

cause for their discovery. Accordingly, petitioner's motion to issue a subpoena pursuant to Rule 6(a) is denied.

## CONCLUSION

Having considered and rejected each of petitioner's claims in support of his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2255, the court denies the petition. The court also denies petitioner's motion to issue a subpoena. All other pending motions are denied as moot.

**ENTER:** **April 11, 2005**

_____
**Robert W. Gettleman**
**United States District Judge**